Good morning, your honors. I'm Terri Rose from the Eastern District of North Carolina and my mother did that to me. I've turned out with the Mr. Rose a lot of times since high school. You know, we're here today, I represent Mr. Jose Pineda. And I was in a I want to take a minute to tell you that I was in a continuing education some years ago and a district court judge, federal district court judge, indicated, made the statement. He said, you know, most cases, attorneys come a lot of times, they seem to have a whole lot of issues. There's usually only one or two, and if you'll resolve that one or two, kind of everything else falls in place. And I think that has a lot to do with this case. We're here because there were three enhancements on the sentencing at the sentencing time. And if you look at whether or not what was deemed relevant conduct, and this court takes a look at it and decides whether or not that's really relevant conduct or not, it kind of deals with all those three enhancements. As you're well aware, relevant conduct is a consideration of any conduct that will apply to the offense of conviction. In this case, Mr. Pineda was on two counts and a possession of a firearm in the furtherance of a drug trafficking, and he was also convicted of possessing a sawed-off shotgun. He was found not guilty of one count of possession of a firearm in furtherance of a drug trafficking crime. When you go to the sentencing court, it's pretty well aware, can you use relevant conduct? Can you use conduct that's not been charged or unconvicted conduct to kind of look at how to form a sentence? And that's well been discussed in terms of the Eighth Amendment and the Sixth Amendment, but sometimes I think what gets forgotten is that that conduct that can be considered has to have a contextual basis to the offense of conviction. It has to kind of explain why the sentencing judge uses what he does or does what he does. It was an assault, and during having that firearm, they hit him with the firearm. It was an assault that was not ever charged or not ever convicted. A sentencing judge may very easily use that conduct related to that offense of conviction that they possessed the firearm to say, I want to increase this sentence because there was other activity that went on and that was more egregious. But that's how that conduct is used. A lot of things come into sentencing. I think the Court's been very clear, the Supreme Court has, that if you start taking just anything that comes into sentencing as a sentencing factor and up someone's sentence based upon that, then that's a violation of the Eighth Amendment. It also undermines the jury, the Sixth Amendment jury right. What we had here in this situation is we had the indictment, Mr. Pinell was indicted on conduct that occurred in January of 2012 and conduct that occurred in February of 2012. That's what he was tried on, that's what was presented at trial, that's what the government decided to indict him on. When we got to sentencing, all of a sudden we got a statement by an unindicted cooperating witness that says in November of 2011, about six weeks, not quite two months, before the conduct that he was indicted on and tried on, we've got this conduct that we've got someone out here that makes a statement to an agent, never appeared at trial, never testified at trial, never testified at the sentencing hearing, has now said Mr. Pinell was involved in another sale of a gun and sale of drugs. And on top of that, they said that the gun that was sold was stolen. And that's it. Mr. Pinell never had a chance to cross-examine and the court found that that was relevant conduct. And it's significant to him because ... Well, it seems to me you're blurring a little bit of the standard of evidence, which I didn't think you were challenging, with the scope of the conduct, whether it has established in the pre-sentence report whether it actually was relevant conduct. And there's two different questions there. If we accept those facts, we still have to address whether it's relevant. Now, if you're also saying that they can't use those facts, that's a different question. I think the hill's a little steeper for you on that. So I thought your argument was that that transaction in November was not related to the ones in January and February. That is my argument, Your Honor. And I probably muddied the water a little bit because I was thinking about also the question of sufficiency of evidence. But my argument really is that that November conduct ... Then you'll probably have to address the fact that the November transaction, the relationship of the various persons in that transaction, and the extent to which those same persons were engaged in January and February. And it looks to me like at least there's a good claim that that conduct in November was really the beginning of everything and led up to the other two. It's sort of one course of conduct. But why don't you address it then? In other words, you're not addressing whether somebody who didn't get cross-examined and so forth was there. You're addressing whether the evidence that's in the pre-sentence report was sufficient to have it considered as part of the conduct conviction. That's correct, Your Honor. But I do want to at least, and I think Judge Niemeyer's hitting this right on point, where we need to go with this. But if there's evidence or there's something out there that is really on the line, it's when somebody says something, the person doesn't even show up in court, there's no document or anything verifying it. And as Judge Niemeyer said, you don't seem to be challenging the evidentiary basis for the fact that it's there. It's the relevancy of it. It's a slippery area. It almost makes you wonder, I mean, I know the judge has discretion. I know he can consider hearsay evidence. He can hear testimony on it. But there's just nothing being said in a pre-sentencing report and boom, now I've got to say it's relevant or not relevant without going to the basis of was any of this even true. But I think Judge Niemeyer put it in the right perspective. That is, it seems that the question for us is the relevancy of it. That's true, Your Honor. And to some part that kind of plays into a little bit about when you decide whether or not the burden of the preponderance of the evidence. And I guess that was the point I was kind of alluding to. Mr. Panetta had no way, it just showed up. That happens pretty commonly in pre-sentencing reports. It just showed up and it came in a report and that was it. But in any event, I think the government has argued and the November started this. But I would say to you it wasn't. Tell me what happened in November. Well, what happened in November is Mr. Panetta was at his father's home and his father had been involved in some drug activity also. A gentleman by the name of Raul Sanchez came and Mr. Panetta's father had the cocaine. And so he sends his son with the cocaine to go make a deal that Mr. Sanchez has set up. It was Mr. Sanchez's deal. He just wants to be sure he gets his money back. And while he's there, Mr. Sanchez also sells to the person they go to see a SKS assault rifle. Was Fonseca there? My knowledge is Fonseca wasn't there. So this Mr. Sanchez's deal, Mr. Panetta's kind of involved because the cocaine came from his father, but it's not a deal he set up. And that's what happened in November the 11th. Well, then when we get to sentencing, all of a sudden we got Mr. Sanchez's statement. And on top of that, Mr. Sanchez's statement says, oh, by the way, the SKS was stolen. And there's no other than his statement. We don't know whether it was stolen or not. As a result of that, we get a two-level enhancement for having three to seven firearms. Well, in the trial... Mr. Panetta had an opportunity to put on evidence, didn't he? I mean, does he dispute that it was stolen? He did in his objections, yes, sir. We certainly objected to all of what Mr. Sanchez... Well, I know all of it in a general sense, but was any evidence proffered of any kind? None was offered of any kind other than that statement. There was nothing from the ATF or anything on the government's behalf other than the statement. His gun was being stored, Sanchez's, no, whose gun was being stored there and was painted there? This was in the November transaction. There was also another sawed-off shotgun that was being stored... There was one painted, and then the sawed-off shotgun was part of the second transaction in February, right? That was the part of the January transaction where he was convicted of possessing a sawed-off shotgun. And I believe that was the one that was painted. There was some question about it being hidden out in the woods, but he was convicted of that. But without the November conduct, you don't get the three firearms because the only convictions that he has involved a .38 caliber pistol and a sawed-off shotgun. There were only two. The evidence was pretty clear that the .38 caliber that was involved in January was the same one he took in February and sold. It was supposed to have been sold in January. So there's not three guns unless you bring in that November conduct. So you don't get that enhancement. There is not the stolen enhancement unless you bring in, because there was no evidence at trial that either the .38 caliber or the sawed-off shotgun were stolen. So you've got two enhancements that are based totally on something that happened in November, which there was no conspiracy charge, no indictment. It doesn't need to be a course of conduct, same course of conduct. But it really wasn't the same course of conduct. In January and February, Mr. Panetta made those contacts with the confidential informant. He set up the deals he met with him. In November, his father just sends him to go with Mr. Sanchez, who's made his own deals. Panetta got the drugs from his father and handed them to Sanchez. That's true. And the gun. But he did not make, he did not contact the confidential informant. He didn't set up the deal. All we've got really is three different drug transactions. There's no indication that there was any, they were all working together. Matter of fact, there is . . . Panetta and Sanchez are common to all of them, and it's at one point Sanchez says, I'm going to deal, would like to deal directly with Panetta as opposed to going through, no, Fonseca.  Fonseca, as opposed to Panetta. Well . . . I mean, this was a . . . There was some testimony that Francesca, and forgive me for my bad southern accent pronouncing these names, but . . . You're probably right, probably Francesca or . . . Francesca. Francesca. There's not any indication that he was involved in November. There is some testimony that Panetta at some point wanted to cut him out, but still, you don't have him at the house, you don't have him dealing with Sanchez. You've just got three separate drug transactions, and that's all. And of course, three individual drug transactions does not make a common course of conduct just because people are selling drugs and guns. Same people. Well, in two cases there were, and he got convicted and tried on those two, then all of a sudden we get . . . All three, and Sanchez is in all three, involved to some extent in all three. I don't know that there was any evidence that Mr. Sanchez was involved in January and February. Well, he was there, wasn't he, in one of the transactions, and then he was offered to be cut out, the first transaction. Panetta says, well . . . There was some testimony from the agent that Mr. Panetta had started dealing with his confidential informant because he wanted Francesca, but no, there was not. Mr. Sanchez was not there. There were videos of both of those drug transactions. He was not there. There was only the confidential informant, Francesca, and Mr. Panetta that were involved. All right. I think you have some rebuttal. Mr. Rubin. Good afternoon. May it please the Court. My name is Phil Rubin, and I represent the United States. We're here to ask the Court to affirm the District Court. The District Court properly applied relevant conduct analysis, and in doing so, applied sentencing enhancements that took account of defendant-specific conduct as the sentencing guidelines intend. And I'd like to jump straight into the relevant conduct that was the subject of the Court's colloquy with Ms. Rose. And specifically, as Judge Niemeyer, you mentioned, the transaction in November involved a lot of the same elements, the same people. Why don't you go through that? It seems to be Mr. Panetta's main argument here, because he gets a lot of help if that transaction is not part of the same course of conduct. And so take us through the three, starting with the November. I see his name is Fonesca, I think. Fonesca, yes, Your Honor. The involvement of Panetta, Fonesca, and Sanchez in each one of them. Tell us what you think the record shows. Certainly, Your Honor. So on November 30th, Mr. Sanchez drove to the defendant's residence, and the defendant's father gave cocaine to the defendant, who then handed it to Mr. Sanchez. Mr. Sanchez also obtained the SKS assault rifle, which the defendant was storing for him at his residence, and the defendant painted it. So Mr. Sanchez had then acquired it. The defendant, Panetta, did paint the gun. That's what I thought happened. That's what's shown in the record. And he picked up the gun, and it had been painted, or whatever painting means. That's right. In the stock or whatever, I don't know. I wasn't sure myself, Your Honor. It's not in the record, but it was painted. And then Mr. Sanchez and the defendant drove together. And I think in the court's colloquy, there was some discussion about whether Mr. Finesco was there. He was the buyer. They drove to his house, and they sold. Mr. Sanchez gave him the one ounce of cocaine and the SKS assault rifle. Finesco was involved in the November transaction. He was, yes, Your Honor. He was the recipient. Tell me the recitationist evidence you're giving here. This arises from the statement of Sanchez. Is that right? It does in part, Your Honor. Where does the rest of it come from? There's a little more that comes in, both from the testimony of Agent Eubanks at trial and the testimony of Mr. Finesco. Now, not all of these details were in their testimony, so some of that is coming from the statement. But the statement in the PSR is corroborated by the testimony. So the informant testified. Regarding the gun used in the earlier conviction, that came from both the agents and others, or just from Sanchez? They mentioned it. And so the informant testified that prior to the acts charged, he met the defendant through Mr. Sanchez, and that Sanchez had attempted to sell him an assault rifle. And the prosecutor asked, did you eventually buy that rifle? And he said yes. Agent Eubanks said something similar during his testimony about how he came to be involved was after the sale of the stolen assault rifle. So that was Sanchez's involvement with the agent and with this informant. And what is the tie of the gun? Tying the gun to Piniella comes only from Sanchez's testimony. Or does it come from his testimony? Well, I would say the testimony at trial corroborates what is given in more detail. The testimony at trial. The testimony from the informant, Mr. Finesco, and from Agent Eubanks. Testified about that 2011 event? They mentioned it. They didn't give the specific date. But the testimony was the informant testified that prior to the acts charged, he met the defendant through Mr. Sanchez, and that Mr. Sanchez had, on one earlier occasion, attempted to sell him an assault rifle. And that then he did eventually buy that assault rifle. And that was during the time when he met the defendant. Which goes to how this is how the later. I'm trying to get the specifics of the earlier transaction. You said the testimony at trial. I don't see how you get the November 11th transaction out of that testimony. They were talking. I think the judge can take from this below that they're talking about the November 30th transaction when the assault rifle was sold. Now, to be sure, the main source of the details on this is the police statement. But as the court discussed with Ms. Rose, by Mr. Sanchez, it's referenced and described in the PSR. As the court discussed with Ms. Rose, he did not, Your Honor. But he didn't have to. Under Section 3661, there's no limit placed on what the court can consider. It's obvious there. I mean, we talked about the public was somewhere and listening to something. You would think that if someone was going to get that level of enhancement, you'd at least bring the person in the court and say, okay, this happened. Rather than just put it on a piece of paper or an investigating officer saying it, which it seems the law has gone in that direction. It really doesn't. I can't follow it. On one hand, we just had cases in which you've got to go all behind to prove something on one hand. And the defendant can be offended. And then we've got this instance where relevant conduct, it is basically anything, looked like to me. I mean, you can just see it. And now the defendant has to get up and say, no, no, it didn't happen. I don't know. This is an area that I'm not sure is settled for where it's going. And this case, to me, really pushes it right to that outer limit as to what is acceptable before we even get to the relevance of it in terms of what the judge can consider as a preponderance of the evidence. Respectfully, Your Honor, I think this case is actually somewhat similar to the main cases that establish this. If we go all the way back and we look at Terry, for example, when Terry said that it's the defendant who bears the burden to contest the facts in the PSR. And, of course, the PSR isn't a party. The PSR is not a litigant. The PSR is the probation office. I agree with you. I think the law has pretty much set this up. I'm just wondering where has it gone with it because this is where we are. We basically just put it in the report. It says that, say somebody said it, and then that's good enough. And now you get up and say it didn't happen. He could have said, well, he shot somebody and killed him in that report. Sounds like to me you could have done what they did in one of the previous cases, murder, and used that as an enhancement. I would disagree on one point, Your Honor, which this case may be somewhat easier for the court in that regard than some of the ones you're talking about because the defendant did not actually object to those facts having happened. The defendant didn't. If you look at the PSR objections, the defendant argues that they're not relevant, that his role wasn't enough in the November transaction. What he does not do is say that it didn't happen. Occasionally it seems to come out here on appeal. I think the one point he's contesting here is the gun. He's not saying the drug transaction didn't happen because he's got three drug transactions. It's the gun deal that makes this, and that's the part that sort of slides in. And if you were clever enough in getting information on this, you'd make sure you put that in there because you've got to be in this area to understand the significance of the gun. When you add that gun in there, that's what this is all about. I agree that the gun is important, Your Honor, but where I disagree— That's how you get the three guns, isn't it? That is correct, Your Honor. I'm saying both Finesca and Sanchez testified about the gun at that November deal. Sanchez did not testify. It was Agent Eubanks and Mr. Finesca. So Sanchez says his gun was being stored with Panetta and was painted by Panetta and returned to him, and Sanchez then sold it to Finesca, which Finesca confirms. That's right, Your Honor. And what we don't have—and I think this is really important. Is it right that the agent says that all that happened? Oh, no, I'm— I'm sorry if I misspoke. I didn't mean to say that that was the testimony at trial. No, I'm not trying to suggest that there was testimony at trial on this. What I'm trying to suggest is that Finesca's testimony at trial corroborated what was imputed to Sanchez. In other words, this isn't just something made up by the probation officer. That's exactly right, and that's exactly the reason, Your Honor, that I was bringing it up. But it corroborated not the fact that the defendant was involved and corroborated that Sanchez had a gun and there was some dealing with a gun. It corroborated something, but it wasn't corroborating what's relevant to this case, and that is the connection of the defendant to that gun. Respectfully, Your Honor, the defendant did not object to that fact from the PSR. Defendant did not object to the facts described in the police report. What the defendant objected to was whether those facts— Not Sanchez's statement. Sanchez's statement, that's right. But you said not that fact. I'm trying to figure out what was there to object to if it didn't corroborate anything. I'll try to be more precise. Defendant's objection wasn't that didn't happen or that's not an accurate statement. What the defendant basically said was, well, if you take those facts, it's not relevant conduct that applies to me. What would the objection have done? I mean, even if he does object, that doesn't keep the trial judge from saying, hey, well, objection overruled. So what? That's correct, Your Honor, although— He has to do more than object, doesn't he? He has to do more than object, but he— It doesn't make any difference if he objects. The objection— Which means he didn't present any evidence to the contractor. That's the next step. He has to present evidence, but he also has to object. He didn't do either. And, yes, I agree, an objection alone would not— Objection is worthless because other than the trial judge can say, okay, I choose not to take it, but it doesn't matter. I mean, that won't keep the judge under this standard from considering it as relevant conduct. It's correct, Your Honor, and if I can take a step back just to clarify— The defendant really has—it's kind of a shifting of a burden. I mean, the defendant, you say something, now you better get up and say it didn't happen or prove. Everything that's contrary in regular criminal law is now shifted in the citizen context where there are years involved. If you don't get up and say that you didn't have that gun or give me some evidence that this didn't happen, then I can find this. And even if you give it, it seems like to me, by preponderance of evidence, based upon that that was given, you still could do it. What I can say, Your Honor, is that the burden is different on sentencing. That is true, and this Court's cases in Terry and Love make very clear that the defendant bears the burden to object and bring evidence on facts that are in the PSR. The defendant— if you use word against that one, it's not—the judge goes one way or the other. That doesn't kill it. You're going to have to basically bring someone in, have some direct testimony and some evidence, either an alibi or something, that it didn't happen. You've got to have some pretty solid stuff to overcome that. I don't know how solid it would have to be, Your Honor. I would certainly have to overcome what the probation office had said in the report and the evidence corroborating it at trial, but what I would— It just seems that it ought to be maybe decency. You ought to bring Sanchez in to say it. If you're going to get a man extra time because he's got extra guns or whatever based upon this enhancement, it just seems like it ought not just be in a piece of paper somewhere. I mean, everything I'm reading and all the other cases have gone— I mean, I agree with Judge Niemeyer in terms of the early case. It seems like it's against any common sense on it. I've got to agree to that. But this sort of goes the other way. It just seems— I mean, you're talking about putting a man in prison. It used to mean something when you put someone in prison for an extended period of time. Just see it in a PSR report, some other criminal said this, and if he doesn't get up and refute it with substantial evidence or something, you can use it against him. And I'm sure there are judges who go both ways on it. That sort of cuts it even more so. The law is what it is. So your point is well taken, and I'm not saying that you are arguing anything against it. I'm just saying that when you look at what this case is about, this is really flimsy. And I'm not saying it's not supported, though, to get you to the relevant argument, but it really is challenging when you see this kind of thing happening. Understood, Your Honor. We think that it is consistent with the law, and further that sentencing has always been different. He's not being put in prison for the November 30th transaction. His sentence is being based in part on it, but he's being put in prison. He's getting a sentence to begin with based on his conviction after a trial. And for long before the sentencing guidelines, courts have been able to look at conduct outside the offenses of conviction when fashioning a sentence. I think the commission was trying to bring that into the sentencing guidelines. But if I could turn, understanding your concerns, Judge Wendt, if I could turn to the relevancy aspect of those facts. As Judge Nemar, you were pointing out, this common scheme or plan, you look at things like common participants, which we very much have. You look at a same purpose. So common participants, two of the three participants in the November 30th transaction were the two participants in the other two transactions. So there's only three participants total. Two of them are present in all three transactions, the defendant and the informant, Mr. Finesca. But it's more than just that. This was the transaction. Again, Judge Nemar, I think you mentioned this. This was how the informant and the defendant got together and eventually decided to cut out Mr. Sanchez, basically. This was the transaction. The informant testified about this at trial. And there was testimony to that's why they got together, to cut out. That's something we are inferring from the way things look. The testimony was that it was after their meeting. And I think this would be this transaction. That was after that. Then Mr. Panetta called the informant and wanted to deal directly with him instead of through Mr. Sanchez. So that actually happened. They'd made the decision to do so after. But this was sort of the meeting that brought the parties together. So that would be the same common scheme or plan analysis. The other way to look at it is same course of conduct. We think either one of these fully supports it. For same course of conduct, you look at the degree of similarity, the repetitions, and the time interval. Here, we've talked about similarity already, and these transactions are really quite similar. They're not just guns and drugs. They're guns and cocaine. They're involving similar participants. They're involving similar amounts of drugs. This isn't just some random occurrence. It's a lot of the same people. Then when you look at the time interval, it was only two months. Which transaction was it after which Panetta called to cut out Sanchez? It was after the 11-30, the November 30th transaction, Your Honor. The two charge conduct transactions were January 25th and February 8th, and those transactions were both the informant, Mr. Finesca, buying directly from the defendant. Which was in accordance with what they had arranged following the November transaction. That's right, Your Honor. The transaction where they first did business. The middle man in the November transaction, and he was cut out for the next two. That's right. They even talked about that during one of the recordings. They talked about how, I believe this is on the lines of, sometimes Sanchez has good stuff, but not always. I think they said something about his prices as well. They even talked about don't tell Mr. Sanchez that we're dealing. All of that sort of feeds together that these transactions are related. Of course, the district court only had to find that by a preponderance, and this court reviews it for clear error. The other thing, and this wasn't discussed with Ms. Rose, but I did want to bring up, because it's in her brief, about the fact that the offense involved three firearms using this relevant conduct. You have the assault rifle. You have the sawed-off shotgun that was sold on January 25th, and then the .380 that was present on the January transaction and then sold on the February transaction. The defendant also argues that because he has a 924C conviction, then that would be impermissible double counting under the guidelines. We disagree, and we think the Tenth Circuit's reasoning in the Terrell case is right on point on that. They're addressing separate conduct. 924C is pertaining to the particular manner the defendant used the weapons in the crime, and then the 2K2.1B1 enhancement relates to a feature or characteristic of the firearms. In the Ward case, unpublished case of this court, citing Terrell, reached the exact same conclusion, and we think that's exactly right. I also just wanted to very briefly address, Ms. Rose mentioned that she contested that the firearm, that there was a stolen firearm on the record. Now, we agree, the one that was stolen was the SKS, so that only comes in as relevant conduct. There are a couple of different routes by which it was shown to be stolen. Aside from the fact it's in the police statement, the testimony at trial talked about, both from the informant and Agent Eubanks, talked about a stolen assault rifle. And then finally, when defendant contested about the assault rifle being stolen when the pre-sentence investigation report came out, the probation officer's response was that ATF had run a trace on it and confirmed that it was stolen. Defendant did not bring that up or contest that before the district court, so the district court was free to rely on that statement from the PSR. I can also go into the other issue in this case about the motion for judgment of acquittal, if the court is interested in that. But if the court has any questions on anything, I'd be happy to answer them. All right. Thank you, Mr. Rubin. You have a question? Thank you, Your Honor. All right. All right. Ms. Rose? Just briefly, Your Honor, there's been a lot made out of that there was testimony connecting Mr. Sanchez to Mr. Panetta. The agent testified that he was the very first witness called. The agent testified that there was a gentleman by the name that he had talked to and a gentleman by the name of Sanchez that knew Mr. Panetta, and that's about the extent of it, and that they were involved in this. Wasn't there the discussions about cutting him out and the benefits of it and not telling him? There was that for Mr. Finesca when he talked about it. I understand, but this is corroborating and this directly relates the subsequent transactions, which are the product of that arrangement, which is in reaction. In other words, to be a sane course of conduct, there was a transformation of the relationships, but it was the same course and it was transformed by Mr. Finesca and Mr. Panetta agreeing to cut out Mr. Sanchez as the middleman, which was the arrangement in the first transaction. That is correct, but the point I was getting to was that there was not any testimony with regards to that firearm, to that SKS. I think there have been some statements made that the agent indicated that Mr. Sanchez had that, and that's how you get Mr. Sanchez. Did Mr. Sanchez say he bought it from Sanchez? Mr. Finesca, in his testimony, talked basically about having bought some drugs from Mr. Sanchez. He did not talk about an SKS. There was very limited. Did he say he later bought the gun? You don't need to read the transcript. Either you know or remember. I've looked at it and I've tried to find mention of the SKS, both by the agent and by Mr. Finesca. They ran it. They had enough information on it. They ran it and tested it and found it was stolen. They ran it and tested it and found it was stolen after they wanted to bring it in as relevant conduct. I understand, but where did the gun come from? Finesca had the gun, right? Mr. Sanchez had the gun. Originally, he sold it to Finesca. I understand, but it was sold to Finesca, and Finesca had the gun. All right. And Finesca confirmed that he had that gun. But that was something that was between Mr. Sanchez and Mr. Finesca. Of course, but it's all part of the same characters. What they're doing is they're cutting out. Panetta is dealing with Mr. In the first transaction, Panetta is dealing with Mr. Finesca through Sanchez, an intermediate. And in the second transaction, they agree to cut him out, and Panetta is dealing with Finesca. Third transaction, Panetta is dealing with Finesca. So you have that continuum. You have the fact that their first transaction was cocaine going from father to Panetta to Sanchez to Finesca. Second transaction, it goes from Panetta to Finesca. Third transaction, it goes to Panetta. In other words, we have the same structure, the same characters. They're just dealing with each other in different ways. But, Your Honor, and I agree with you. I don't disagree with anything. That's the facts. That's what happened. But there were three different drug transactions. And, you know, in U.S. v. Hodge, they've said that's not enough to bring this outside activity into. You're not addressing the standard by which we find the same course of conduct. And the same course of conduct is defined by the nature of the product. Is it marijuana versus cocaine? Is it the same people? Is it within a relatively contiguous time? In other words, all these things we look at to decide whether it's part of the same course or scheme. But even if you look at that, the same course of conduct, you've got to also look at the offense of conviction. He wasn't convicted of anything but what happened in January and February. You can't just take what happened over here and decide that because you like the facts, there's a stolen gun and that makes three to seven. You can add it to it. It's whether those facts are part of the same course. He wasn't convicted of the November transaction. Well, he wasn't charged with the November transaction. And the government did not choose. But the sentencing guidelines say we are going to allow the court to include transactions which are relevant. And in defining relevance, it's either the same scheme or the same course of action. And in defining the same course of action, you look at various elements. And I'm suggesting almost every one of those elements is satisfied here. And I'm suggesting that when you look at relevance, you also have to look at relevance of that conduct in relation to the offense conduct. That's what I'm saying. And the cases give you a guidepost for doing that. And you need to take us through that. And the question is, did it involve the same type of products? Did it involve the same type of people? Same types of transactions? Same location? Same general time? These are the types of things you look at to see whether it's a course of action. Well, as far as same general time, you've got November, then you've got January, then you've got February. They're not all happening within the same month. They're not all happening at the same time. You've got some people in the November transaction, then some of those people drop out. You have the same two people throughout, Panetta and Finesca. Same two people. In different relationships. You have the supplier and the purchaser, both all the way through. And you just have a different means in the second two. Sanchez is cut out. Then it makes it two different, it just makes it two, three separate different drug transactions. And I guess your point would be is that it is relevant in the course of conduct in so far as the drug transaction, but it's business about the gun. That's the only reason why it's good. The business about the gun is. . . It's the gun. That you've thrown in a gun in one of these, and now because he's been doing drugs, all of a sudden now you pull in a gun, which he has no connectivity to, and there's no testimony other than Sanchez come up in the middle of it, and now all of a sudden that's relevant. And not only that, it comes up in the course of a statement. Including anything else he would have done, I guess. It comes up in the course of a statement made to an agent, made to another agent. If you include the transaction in November, then you include the whole transaction. And the whole transaction was Panetta had possession of this stolen gun. Or it turned out to be stolen, and that doesn't matter when the establishment. But he had possession of this gun. He turned it over to Sanchez. Sanchez turned it over to Finesca, and Finesca acquired that gun, which is later determined to be stolen. There is an allusion by Sanchez that it's also stolen, but that's not necessary. We have an actual run. . . The ATF runs it and finds it stolen. So I don't understand how you can take the November transaction and say we're going to include just the drug part and exclude the gun part. I don't think we need to include anything out of November, because I don't think it applies. I don't think it applies as relevant conduct. And at the point of being just maybe a little bit picky, what the facts were was that Mr. Panetta was at his father's home. Nobody ever established who was hiding the gun, whether it was Mr. Panetta, or this was something that Mr. Panetta's father was hiding from Mr. . . . And that's part of what makes it such a problem. There's a lot of ambiguity that nobody ever brought anybody to court, talked about, testified, and then all of a sudden we go from a sentence that would have been somewhere between 27 to 33 months to 63 to 78 based upon a whole lot of speculation. What we end up is some good inferences and circumstantial evidence that we here can pool together and tie it in as though it's fact. But when you look at the actual testimony, it doesn't tie in. No one tied it in like that. Only us on the appellate level and the trial court may have, but no testimony or anything tied it that way. It may just look like it is, but you just really don't have anybody that says that's what happened. It looks like that. And I suppose that's the crux of my argument, is you just can't come in at the back end and say we're here. The reality is we know that Mr. Panetta had been charged with two 924Cs. If he'd have been convicted, it would have been a lot more time. Okay, I think we understand. You were court appointed? Yes, sir. I'd like to recognize that and thank you for your service to the court. It's nice to have you. We'll come down and greet counsel and adjourn for the day. This honorable court stands adjourned until tomorrow morning at 930. God save the United States and this honorable court.
judges: Paul V. Niemeyer, James A. Wynn, Jr., Henry F. Floyd